**MORRISON v. MITCHELL. (No. 9930.)**

(Court of Civil Appeals of Texas. Fort Worth. April 15, 1922. Rehearing Denied May 20, 1922.)

**1. Limitation of actions ⬅127(4) — Supplemental petitions in actions on note held not new cause of action.**

In an action by a corporation's receiver on a note payable to the corporation, where the original petition alleged that the defendant subscribed for stock of the corporation and executed the note sued on as security for sub- scription contract, and hypothecated shares of another corporation as additional security for subscription contract, supplemental petition, alleging that if for any reason the note was unenforceable the plaintiff was entitled to recover amount thereof by reason of the fact that defendant's agent had subscribed for the stock, that the corporation had issued the stock, and that defendant had placed his name on the books as stockholder, and that defendant had ratified and acquiesced in the action of the agent, and was therefore estopped to deny that he was bound thereby, held not to state a cause of action different from that pleaded by the original petition, as respects limitations.

**2. Corporations ⬅92—Evidence held to prove that defendant executed note in payment for stock.**

In action by receiver of corporation on a note defended on the ground of failure of consideration, evidence held to prove that defendant knew that the stock had been issued to him by the corporation, and that he executed the note in payment therefor.

**3. Corporations ⬅92—Failure of consideration no defense as against receiver on stock subscription note.**

In action by receiver of corporation on note executed in payment for stock for which the defendant had subscribed, which was being held by the corporation as security for the payment of the note, the defendant could not defend on the ground of failure of consideration on theory that the stock had never been delivered; such defense not being available as against the corporation's creditors.

**4. Corporations ⬅388(4)—Maker of note for stock, who knowingly participated in ultra vires act, estopped to urge invalidity of act as defense.**

Maker of note for stock, who knowingly participated in an ultra vires act, is estopped to urge the invalidity of the act as a defense to a suit on the note.

Appeal from District Court, Tarrant County; Ben. M. Terrell, Judge.

Action by J. W. Mitchell, receiver of the Commonwealth Bonding & Casualty Insurance Company, against Earl Morrison. Judgment for plaintiff, and defendant appeals. Affirmed.

Garee, Odell & Allen and Ernest May, all of Fort Worth, for appellant.

Ocie Speer and Marvin H. Brown, both of Fort Worth, for appellee.

DUNKLIN, J. Earl Morrison has appealed from a judgment rendered against him in favor of J. W. Mitchell, receiver of the Commonwealth Bonding & Casualty Insurance Company, hereinafter called bonding company, upon a promissory note for the principal sum of $600, signed by Morrison and made payable to that company. The trial was before a jury, and the judgment rendered was upon a verdict returned in

obedience to a peremptory instruction from the court.

During the month of July, 1910, the defendant, Morrison, subscribed for 25 shares of capital stock in a corporation known as the Bankers' Trust Company, thereafter to be organized. The face value of the stock was $10 per share or $250 in the aggregate, but the subscription included $30 per share to go into the treasury of the corporation as a surplus. On April 12, 1911, the 25 shares of stock in the Bankers' Trust Company so subscribed by Morrison was issued to him. At the time Morrison gave his subscription for stock in the Bankers' Trust Company he did not pay any cash, but in lieu thereof executed two promissory notes payable to himself, which he indorsed to that company, one for the principal sum of $250 and another for the principal sum of $750. The note for $250 was paid to the Bankers' Trust Company prior to its incorporation. On March 16, 1912, Morrison paid to the Bankers' Trust Company $150 of the principal of the $750 note, and executed a renewal for the balance, to wit, $600, the note maturing December 1, 1912, and made payable to the order of the Bankers' Trust Company. On December 1, 1912, he executed a second renewal of the $600 note, but the same was made payable to the order of the bonding company. Prior to the execution of the last renewal note, and on, to wit, July 25, 1911, one R. T. Stuart, purporting to act for himself and others whom he styled his associates, offered to purchase from the bonding company $150,000 worth of its capital stock on a basis of $1 to capital and $3 to surplus. That offer was accepted by the board of directors of that company by resolution duly adopted, which further directed that the stock be issued direct to the parties in whose names the offer was made, a list of whom had been furnished by Stuart. The offer to purchase the stock was to give "securities" therefor. It is to be inferred from the evidence that Morrison's name was on the list so furnished by Stuart of proposed purchasers of the stock, and that the offer by Stuart included an offer to buy for Morrison 18¾ shares of stock in the bonding company. On the basis stated in the resolution passed by the board of directors "of $1 to capital and $3 to surplus," the offer so accepted was equivalent to an offer to pay the bonding company $750.

The evidence further shows that in consideration of the stock to Morrison the Bankers' Trust Company agreed to transfer to the company issuing the stock Morrison's note for $750 theretofore given by him to the Bankers' Trust Company for the surplus on the 25 shares of stock for which Morrison had subscribed in the latter company. On July 25, 1911, and after the adoption of the resolution by the board of directors of the

bonding company above mentioned, 18¾ shares of the capital stock in the latter company was issued to Morrison, and thereafter Morrison's name was carried on the books of the latter company as a stockholder. The evidence shows that the two companies mentioned had substantially the same board of directors, and both companies were duly incorporated. The evidence further shows that after the 25 shares of stock in the Bankers' Trust Company was issued that stock was held by that company as collateral security for the payment of the balance of Morrison's subscription of $750. Notwithstanding the adoption of the resolution above referred to by the bonding company and the issuance of the stock by that company to Morrison on July 25, 1911, in consideration of the transfer to it of the $750 notes theretofore executed by Morrison to the Bankers' Trust Company, the latter company collected $150 on that note on March 16, 1912, and took from Morrison a renewal note for $600, payable to itself, due December 1, 1912, as above noted. And not until the last-named date did Morrison execute the note herein sued on for $600 and made payable to the bonding company.

It is undisputed that Morrison never signed any subscription contract to take stock in the bonding company, and never participated in any of the meetings of the stockholders or directors of that company. In his original petition, the receiver alleged that Morrison had entered into a certain subscription contract in writing, whereby he subscribed for and agreed to pay to the bonding company $750 for 18¾ shares of capital stock of that company, and that thereafter he delivered to the bonding company the $750 note mentioned above, which he had already given to the Bankers' Trust Company for the 25 shares of stock in that company, and that thereafter the defendant executed the note sued on, dated December 1, 1912, as further security for his subscription contract for the stock and that he also hypothecated the 25 shares of the Bankers' Trust Company stock as additional security for his said subscription contract, and plaintiff prayed for a judgment for the amount due on the $600 note, together with a foreclosure of the lien upon the Bankers' Trust Company stock which had been deposited as collateral security as aforesaid.

The defendant Morrison filed an answer, which, among other things, contained an express denial that he had executed any subscription for stock in the bonding company. He also pleaded his subscription contract for stock in the Bankers' Trust Company and the execution of his two notes, one for $250 and one for $750, given in payment of that subscription. He further pleaded the execution of the note in controversy under the belief that he was thereby paying for his stock in

the Bankers' Trust Company; and at the time he executed it he informed the bonding company that he had not subscribed for stock in that company, and did not intend so to do; that thereafter he on many occasions repeated such statements, and repudiated any rights as a stockholder in that company; that he never received any stock in the bonding company, and that he had never performed any functions as a stockholder in the bonding company. The facts so alleged were made the basis of his plea of a failure of consideration for the note sued on.

By his first supplemental petition, plaintiff prayed directly for recovery on the $600 note, but further alleged that if for any reason the note was unenforceable the plaintiff was entitled to recover the amount of said note, with interest, by reason of the fact that the defendant through his duly authorized agent, R. T. Stuart, had subscribed for 18¾ shares in the bonding company, by the terms of which subscription contract the defendant obligated himself to pay the sum of $40 per share, which included $10 per share to the capital of the company and $30 per share as surplus, aggregating the sum of $750, of which amount $150 had been paid, leaving a balance of $600, with interest thereon; that the defendant had held himself out to the public as a subscriber and stockholder in the bonding company, and had permitted the corporation to hold out to the public that he was such stockholder, and that by reason of all those facts the defendant is estopped from denying his liability to the plaintiff as receiver of the bonding company to the extent of the unpaid balance for said stock.

In reply to that supplemental petition, the defendant pleaded the statutes of two and four years' limitation upon allegations that by the first supplemental petition a new cause of action had been set up which was separate and distinct from the one previously pleaded, in that the cause of action set up in the supplemental petition is not based upon any contract in writing, as alleged in plaintiff's petition; and that said new cause of action had accrued more than two years before the filing of the supplemental petition; and that said oral contract so pleaded in the petition had accrued more than two years before the filing of said supplemental petition;. and that the cause of action based upon the alleged written contract set out in the supplemental petition made by Stuart as the defendant's agent had accrued more than four years prior to the filing of said supplemental petition, and that both causes of action were therefore barred.

By another supplemental petition plaintiff alleged that if it be true that Stuart was not the agent of the defendant with authority to subscribe for stock in the bonding company, yet he did cause such subscription to be made, and the company did issue the stock to the defendant, and placed his name upon its books as a stockholder, and thereafter the defendant, knowing that the stock had been so subscribed and issued, did ratify and confirm the same, and permitted his name to be carried as a subscriber and owner of the stock, by reason of all of which he had ratified and acquiesced in the action of said Stuart, and is now estopped to deny that he is bound thereby. All of the allegations set up in the supplemental petitions were duly denied by the defendant in his pleadings.

The plaintiff introduced in evidence a letter dated May 15, 1912, which was prior to the execution of the note in controversy, from the defendant, addressed to Coke W. Harkrider, at the Flatiron building, Fort Worth, Texas, who was one of the directors of the bonding company, and who had secured his subscription in the first instance to the Bankers' Trust Company, in which he acknowledged the receipt of several letters with reference to the stock in the bonding company, and in which he asked for an explanation of the meaning of those letters, and this letter contained the following statement:

"As I recollect that I asked to sell my Bankers' Trust Company stock, but not to. sell the Commonwealth, not unless you had to, in order to make a sale of the Bankers' Trust Company stock, and in that case it would be all right to sell the Commonwealth. I would like to hear from you, and what you think of the sale of the Bankers' Trust Company's stock being made; as I had gone this far with the matter, I want to sell the stock, that is the Bankers Trust Company stock, or as you think best, for I had made my arrangements to that effect.

"Please let me hear from you, and what you know about the sale of the Bankers Trust Company stock and when we may expect the proceeds from the same."

The defendant testified as follows:

"It is my recollection that at the time I signed said note I did not notice that it was payable to the Commonwealth Bonding Casualty Insurance Company, and it is my recollection that I made some inquiry at the time as to why it was payable to that company. I wrote to the Bankers' Trust Company about it, but I did not receive any reply. The payment of $150 on this $750 note was acknowledged by the Bankers' Trust Company, and I also received a letter from the Bankers' Trust Company at that time acknowledging receipt of the renewal note. This letter was signed by Ben F. Allen, treasurer.

"The note which has been introduced in evidence in this case is a renewal of the $750 note mentioned in these various letters, and which has also been introduced in evidence; it is a renewal of the balance due on the $750 note. It seems to me that at that time I did have some correspondence or communication with the Casualty Company with reference to that note. I think that renewal note was mailed to the Bankers' Trust Company, and they

acknowledged receipt of it, as shown by one of those letters. I do not think that I knew that this note had a connection with any stock of the Commonwealth Bonding & Casualty Insurance Company. As to whether or not any stock of the Commonwealth Bonding & Casualty Insurance Company was issued to me for this note, I did not know what to think about that—I wanted to know, I wrote them to know about that, and I did not want to lose my stock in the Bankers' Trust Company, if they were issuing me any stock with the $600 note, I did not figure that that was the proposition; I did not know but what they were giving me some stock, on the side, or something of that kind. I did not receive any reply from them to my letter making inquiry about that. I did not at any time know that stock had been issued to me in the Commonwealth Bonding & Casualty Insurance Company until this suit was brought. I do not think they ever sent me any stock of the Commonwealth Bonding & Casualty Insurance Company; I do not think I ever received any. I never received any stock at all in consideration of this note, in any company, that I know of.

"In March, 1912, I wrote to Mr. Harkrider: 'It was a surprise to me to know that I owned any stock whatever in the Casualty Company, just how and why I came by it I do not know, however, I appreciate the same.' It seems that I knew at that time that I owned stock in the Commonwealth. * * *

"I knew there was a difference between the Bankers' Trust Company stock and the Commonwealth Bonding & Casualty Insurance Company stock. I told them that I had not instructed them to sell the Commonwealth stock unless they had to. I was talking about any Commonwealth that was issued to me; I did not know the manipulation down there; I did not understand that. * * * After that, in December, 1912, I made this note, nearly a year afterwards, and I mailed that $600 note to the Bankers' Trust Company. I knew I had stock; that is, some stock in the Commonwealth Bonding & Casualty Insurance Company had been issued in my name by some kind of manipulation or something of the kind."

Again, and in a letter dated Colorado, Tex., March 15, 1912, the defendant says:

"It was a surprise to me to know that I owned any stock whatever in the Casualty Company, just why and how I came by it I do not know; however, I appreciate the same."

[1] We do not believe that any new cause of action was set up by the supplemental petitions filed by the plaintiff. In the original petition a recovery was sought upon the note in controversy just as was sought in the supplemental petitions. Those supplemental petitions did contain allegations of facts not pleaded in the original petition, but they were merely in aid of the recovery originally sought and contained allegations of additional facts to strengthen the right of recovery on the note. Hence we are of the opinion that defendant's pleas of the statutes of limitation were properly overruled. Thompson v. Swearengin, 48 Tex. 555; Schau-er v. Von Schauer (Tex. Civ. App.) 138 S. W. 145; Kendall v. Riley, 45 Tex. 20.

[2, 3] We are of the opinion that the letters written by the defendant in connection with his testimony on the witness stand show conclusively that the defendant knew that stock had been issued to him in the bonding company, of which plaintiff is the receiver, and that he executed the note in controversy in this suit in payment for that stock. The evidence further shows that that company later became insolvent, and that the plaintiff, as receiver, was ordered to take over its assets, with authority to institute suits to collect any and all obligations due it for the purpose of realizing funds with which to pay off its creditors. The note in controversy was one of the assets which came into the hands of the receiver, and it represents the unpaid balance due by the defendant for the capital stock which had been issued to him. The following authorities, we think, have settled the law to be that in such cases the stockholders are estopped to deny liability upon their obligations given for such stock on such defenses as those alleged in the present suit: Mitchell v. Porter (Tex. Com. App.) 233 S. W. 197; Thompson v. First State Bank of Amarillo, 109 Tex. 419, 211 S. W. 977; Davis v. Mitchell (Tex. Civ. App.) 225 S. W. 1117.

The case of Commonwealth Bonding & Casualty Insurance Co. v. Curry (Tex. Civ. App.) 183 S. W. 1, has been strongly urged by appellant as supporting his defense of failure of consideration in the present suit. If the present suit had been instituted by the company itself rather than by its receiver, we believe appellant's contention would be correct. But it was instituted by the receiver of the company after the same had become insolvent, and according to the decisions of our Supreme Court, cited above, a different rule applies.

The evidence shows that the 18¾ shares of stock which was issued in the name of the defendant was never in fact delivered to him, but was held in the office of the company for his benefit and with his knowledge and acquiescence. But the fact that the defendant did not have manual possession of it had no material bearing upon the issue of his liability upon the note in controversy. Turner v. Cattleman's Trust Co. (Tex. Com. App.) 215 S. W. 831. As appears from the facts recited above, the note for $750, which defendant originally executed for stock in the Bankers' Trust Company, was taken out of the treasury of the latter company and turned over to the bonding company in payment for the stock issued in the name of the appellant. It is insisted that the act of so diverting the assets of the Bankers' Trust Company without any consideration paid to that company was an ultra vires act and a fraud upon the creditors and stock-

holders of the Bankers' Trust Company, and therefore neither the bonding company nor its receiver can be said to be innocent purchasers of the note in controversy, and for that reason plaintiff was not entitled to recover.

Appellant has cited 2 Fletcher on Corporations, p. 2144, wherein it is said:

"A corporation cannot sell, mortgage or lease property for the individual benefit of an officer or shareholder."

[4] Many other authorities are cited to the same effect, such as 2 Fletcher on Corporations, p. 2195; Stacy v. Glen Ellyn Hotel Co., 223 Ill. 546, 79 N. E. 133, 8 L. R. A. (N. S.) 966. Notwithstanding those authorities, we believe it settled by the decisions of our Supreme Court, cited above, that appellant is estopped from invoking those authorities to support his defense in this case, since it is undisputed that he knew that the note in controversy, payable to the bonding company, was issued in renewal in part of the $750 note originally executed by him to the Bankers' Trust Company, which had come into the treasury of that company as surplus capital. He thus knowingly participated in an ultra vires act, and is estopped from urging the invalidity of that act as a defense to this suit.

Under the undisputed facts and evidence recited above, the court did not err in giving the peremptory instruction in favor of the plaintiff, and for the reasons noted the judgment of the trial court is affirmed.